152 P.3d 587

Charles **MELICHAR** and Karen Melichar, husband and wife, Plaintiffs–Appellants,

v.

**STATE FARM FIRE AND CASUALTY COMPANY, Defendant–Respondent,**

and

**Western Building Maintenance, Inc., an Idaho corporation, Defendant.**

No. 31714.

Supreme Court of Idaho, Boise, December 2006 Term.

Jan. 26, 2007.

Angstman Law, PLLC, Boise, for appellants. Wyatt B. Johnson argued.

Elam & Burke, P.A., Boise, for respondent. Jeffrey A. Thomson argued.

JONES, Justice.

This case involves an alleged breach of a homeowner's insurance policy. Appellants, Charles and Karen Melichar, sued Respondent, State Farm Fire and Casualty Company ("State Farm"), for breach of contract, breach of implied warranty, and breach of express warranty after State Farm failed to pay for mold related damages to their home resulting from an accident. The district court issued a directed verdict in favor of State Farm. We affirm.

## I.

The Melichars are homeowners in Boise. They previously maintained homeowner's insurance through State Farm. Two of the Melichars' past homeowner's policies are relevant to this case. The first relevant policy had a policy period of July 12, 2001, to July 12, 2002 ("first homeowner's policy"). The second relevant policy had a policy period of July 12, 2002 to July 12, 2003 ("second homeowner's policy"). The two policies were identical except that the second homeowner's policy contained a mold exclusion endorsement, which excluded coverage of mold related losses occurring during the policy period.

On March 25, 2002, while the Melichars were vacationing in Arizona, their son checked on their house and discovered the

toilet had overflowed, which caused water damage to the property ("March accident"). Laurie Burlile, the Melichars' daughter-in-law, called the Melichars that day to advise them of the situation. The Melichars immediately contacted State Farm and informed it of the problem. State Farm proceeded to open a claim and determined that the damages were covered under the Melichars' policy. The Melichars' insurance agent advised them that the released water needed attention immediately. In response, the Melichars asked if State Farm "had anybody that did that kind of thing." State Farm informed them that it had someone who could take care of it, and the Melichars verbally authorized State Farm to begin work on the house. At the time, State Farm maintained a "Premier Service Program," which provided insureds who did not wish to procure their own contractor the option of selecting a participating State Farm-approved Premier Service Program contractor to perform repair work.

The next day, March 26, 2002, Laurie met at the Melichars' home with a State Farm insurance adjustor who recommended hiring a disaster company. When Laurie voiced no preference for a particular company, the adjustor contacted Western Building Maintenance ("Western"), a State Farm-approved Premier Service Program contractor, to perform the repairs. Western arrived shortly thereafter, and either a representative of Western or State Farm asked Laurie to sign an "authorization to repair" form. Laurie signed the form using her mother-in-law's signature, "Karen Melichar," and Western began performing repairs.

The Melichars returned home on April 6, 2002, to find ongoing construction and repairs. Upon their return, they found a letter from State Farm, dated March 27, 2002, explaining the Premier Service Program ("March 27 letter"). The letter stated that the Melichars selected Western as the Premier Service Program contractor to perform the repairs on their home. On April 29, 2002, Charles Melichar signed an "authorization to repair" form, which acknowledged that the Melichars agreed to use the State Farm Premier Service Program and authorized Western to repair the damages resulting from the March accident.

Near the end of July 2002, the Melichars informed State Farm and Western of their concern regarding an outbreak of mold in their home. State Farm arranged for an industrial hygienist, Summit Environmental, Inc., to perform a mold and fungal evaluation of the house. Summit Environmental conducted the evaluation and prepared a report stating that portions of the home were impacted with mold growth, and recommended mold remediation. In August, Western began conducting the mold remediation and on December 13, 2002, Summit Environmental issued a post remedial report which stated that the mold was fully remediated. State Farm paid all expenses associated with the repairs and remediation resulting from the March accident up to this point.

On or about December 24, 2002, the Melichars noticed that the floor near the washing machine was beginning to ridge and buckle. On December 26, they notified State Farm of the problem, and upon inspection State Farm learned that Western had improperly inserted a drain hose from the Melichars' washing machine into a wall cavity where there was no drain pipe. As a result, water from the washing machine had drained into the wall cavity causing structural and mold damage to the Melichars' property ("December accident"). On December 27, 2002, State Farm sent the Melichars a letter stating that the December accident resulted in a second loss that was subject to the Melichars' second homeowner's policy and, because it contained a mold exclusion endorsement, no coverage would be provided for "testing, remediation, or any other repairs in reference to mold or mildew damage in respect to the second loss." State Farm subsequently paid or offered to pay for the non-mold related damages arising from the December accident. However, when State Farm failed to pay for mold related damages resulting from the December accident, the Melichars sued, alleging breach of contract, breach of implied warranty, and breach of express warranty.[1]

1. The Melichars initially filed suit against both State Farm and Western. Prior to trial however,

The case went to trial and, upon the conclusion of the Melichars' case-in-chief, State Farm moved for a directed verdict. The district court granted State Farm's motion, finding that the damages sought—the cost associated with remediation of mold-related damage resulting from the December accident—constituted a second loss subject to the second homeowner's policy, which excluded coverage for such damages. The court further held that the Melichars presented no evidence that State Farm breached either an express or implied warranty.

## II.

We will address four issues in this opinion: (1) whether State Farm's failure to pay for remediation of the mold damage associated with the December accident constituted a breach of contract; (2) whether State Farm's failure to pay for such remediation constituted a breach of warranty; (3) whether the district court's award of costs to State Farm should be reversed; and (4) whether either party is entitled to an award of attorney fees or costs on appeal.

## A.

 When reviewing a district court's decision to grant or deny a directed verdict, this Court applies the same standard as does the trial court. *Gunter v. Murphy's Lounge, LLC,* 141 Idaho 16, 27, 105 P.3d 676, 687 (2005). This Court does not defer to the district court's findings, but rather conducts an independent review of the evidence. *Id.* This Court "must determine whether, admitting the truth of the adverse evidence and drawing every legitimate inference most favorably to the opposing party, there exists substantial evidence to justify submitting the case to the jury." *General Auto Parts Co., Inc. v. Genuine Parts Co.,* 132 Idaho 849, 855, 979 P.2d 1207, 1213 (1999). A directed verdict will only be granted in favor of the moving party if the evidence presented is so clear that "all reasonable minds would reach only one conclusion: that the moving party should prevail." *Powers v. American Honda*

*Motor Co., Inc.,* 139 Idaho 333, 335, 79 P.3d 154, 156 (2003).

## B.

The district court did not err in directing a verdict in favor of State Farm with respect to the breach of contract claim because under the policies' terms, the loss resulting from the December accident was subject to the second homeowner's policy. The Melichars argue that the district court erred in finding that two separate losses occurred under the policies' terms because it is reasonable to interpret all the damages in this case as a single, continuing loss resulting from the March accident, which State Farm is obligated to repair and replace under the first homeowner's policy. The Melichars' interpretation is contrary to the clear and unambiguous terms of the Melichars' homeowner's policies.

### i.

 Whether an insurance policy is ambiguous is a question of law, which this Court freely reviews. *AMCO Ins. Co. v. Tri–Spur Inv. Co.,* 140 Idaho 733, 739, 101 P.3d 226, 232 (2004). A policy "is ambiguous if 'it is reasonably subject to conflicting interpretations.'" *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.,* 141 Idaho 660, 663, 115 P.3d 751, 754 (2005). Any ambiguities in an insurance policy must be construed against the insurer. *Farmers Ins. Co. of Idaho v. Talbot,* 133 Idaho 428, 435, 987 P.2d 1043, 1050 (1999). However, where the policy language is clear and unambiguous, "coverage must be determined in accordance with the plain meaning of the words used." *Mutual of Enumclaw Ins. Co. v. Roberts,* 128 Idaho 232, 235, 912 P.2d 119, 122 (1996).

The parties dispute the meaning of the term "loss" within the context of the homeowner's policies. Although the term "loss" is not defined in the "definitions" section of either policy, the types of losses that will be covered under the policies are addressed in the "losses insured" section:

**COVERAGE A—DWELLING**

the Melichars accepted Western's offer of judgment pursuant to Idaho Rule of Civil Procedure

68 for $50,000. Western was subsequently dismissed from the suit.

We insure for *accidental direct physical loss* to the property described in Coverage A, except as provided in **SECTION I—LOSSES NOT INSURED.**

(italics added). The plain language of this section unambiguously establishes that the term "loss" is contemplated by the policies to mean the resulting *physical* and *direct* damage caused by an accident.

■■■ Additionally, the Melichars contend that the term "occurs" is ambiguous because it is undefined in the policies and is subject to multiple interpretations. The Melichars' homeowner's policies provide:

1. **Policy Period.** This policy applies only to loss under Section I or **bodily injury** or **property damage** under Section II which *occurs* during the period this policy is in effect.

(italics added) The term "occurs" is not further defined in the policies, but the mere fact that a term is undefined in a policy does not make that term ambiguous if it has a settled legal meaning. *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Dixon*, 141 Idaho 537, 540, 112 P.3d 825, 828 (2005). It is well settled in Idaho that "the time of the *occurrence* of an 'accident,' within the meaning of a liability indemnity policy, is not the time the wrongful act was committed but the time the complaining party was actually damaged." *Millers Mut. Fire Ins. Co. of Texas v. Ed Bailey, Inc.*, 103 Idaho 377, 379, 647 P.2d 1249, 1251 (1982) (emphasis added) (quoting *National Aviation Underwriters, Inc. v. Idaho Aviation Ctr. Inc.*, 93 Idaho 668, 670, 471 P.2d 55, 57 (1970)). In *Millers Mut. Fire Ins. Co.*, this Court adhered to the reasoning that "[t]o stretch the scope of 'accident' backward in time to reach the date of the earliest beginning of any prior event which might be regarded as having a causal relation to the unlooked-for mishap would introduce ambiguity where none now exists." 103 Idaho at 380, 647 P.2d at 1252 (quoting *Home Mut. Fire Ins. Co. v. Hosfelt*, 233 F.Supp. 368, 370 (D.Conn.1962)). Thus, even though the term "occurs" is not defined in the policy, our case law makes clear that an accident occurs during the policy period in which the policy holder was actually dam-

aged, and not the period in which the event giving rise to the loss occurred.

ii.

■■ The district court correctly concluded, after applying the policies' terms to the facts and circumstances in this case, that there were two separate losses—the first covered by the first homeowner's policy and the second covered by the second homeowner's policy. It is undisputed that the water released into the Melichars' home as a consequence of the March accident physically and directly caused damage to the Melichars' home and the July mold outbreak. Both the event directly causing the loss, the overflowing toilet, and the resulting loss itself, the structural and mold damages, occurred during the policy period of the Melichars' first homeowner's policy, which was effective from July 12, 2001, through July 12, 2002. Because the first homeowner's policy did not include a mold exclusion endorsement, State Farm paid for the repair and replacement of all the resulting damages, including the cost of mold remediation. It is also undisputed that the July mold outbreak was fully remediated prior to the December accident. In fact, the sole relief the Melichars seek in this case, and the only alleged covered expense the Melichars contend State Farm has failed to pay, is the cost associated with remediation of the mold damage that occurred as a result of the December accident.

Contrary to the Melichars' assertions, the damages resulting from the December accident were subject to the second homeowner's policy. The physical and direct cause of the December mold outbreak was the water released in December from the improperly plumbed washing machine. The record reveals that sometime in December, as Western was concluding the remediation of the July mold, it improperly inserted a drain hose from the Melichars' washing machine into a wall cavity where there was no drain pipe, resulting in a water release, and a subsequent mold outbreak. Both the event directly causing the loss, the improper placement of the hose, and the resulting loss itself, the mold outbreak, occurred during the policy period of the second homeowner's policy, which was effective from July 12, 2002,

through July 12, 2003. Undoubtedly, the December accident would not have occurred had Western not been present in the Melichars' home to repair the damages resulting from the March accident. However, while the water released as a result of the March accident may have been an *indirect* cause of the December accident, it certainly was not the *physical* and *direct* cause.

In sum, the Melichars' argument that the December loss is a single, continuing loss resulting from the March accident because it is causally related is incongruous with both the policies' terms and this Court's holdings in *National Aviation Underwriters* and *Millers Mut. Fire Ins. Co.* The district court correctly concluded that the December accident resulted in a separate loss subject to the Melichars' second homeowner's policy, which excluded coverage for such damages. Therefore, State Farm did not breach either homeowner's policy by failing to pay for mold related damages resulting from the December accident.

## C.

■■■ The district court did not err in granting State Farm's request that a directed verdict be entered against the Melichars with respect to the breach of warranty claims. The Melichars argue that State Farm breached an express warranty contained in the March 27 letter by failing to require Western, pursuant to a pre-existing contract it had with Western, to provide the Melichars with a written warranty covering its work. The March 27 letter, which the Melichars received from State Farm regarding the Premier Service Program, provided that "[y]our contractor will warranty their workmanship labor on building or structural repairs, for a five year period." Relying on this language, the Melichars assert that State Farm expressly warranted that Western would provide them with a written warranty covering their work. That Western did not provide a warranty to the Melichars in this case is uncontested. However, State Farm did not warrant the repairs; it only indicated

that the contractor would give a five-year warranty. Although the Melichars did not receive a warranty, for reasons that are disputed, their remedy was to pursue the contractor for improperly reconnecting the washing machine hose. The Melichars have already succeeded in that pursuit, having accepted an offer of judgment from Western for $50,000 in the early stages of this lawsuit, and they cannot now pursue State Farm because they did not recover as much as they thought they were entitled from Western. Thus, the district court did not err in entering a direct verdict against the Melichars with respect to the breach of express warranty claim.[2]

■■■ The Melichars further contend that State Farm breached the implied warranty of workmanlike performance. This Court has held that where a party provides personal services, a "warranty is implied that the services will be performed in a workmanlike manner." *Hoffman v. Simplot Aviation, Inc.*, 97 Idaho 32, 36, 539 P.2d 584, 588 (1975). Additionally, this Court adheres to the rule that "privity of contract is required in a contract action to recover economic loss for breach of implied warranty." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 354, 544 P.2d 306, 312 (1975). In this case, Western provided the personal services necessary to repair the Melichars' home, not State Farm. Nevertheless, the Melichars argue that State Farm is liable for the implied warranty of workmanlike performance based on agency theory.

■■■ As a general rule, independent contractors are not agents. *See Pinson v. Minidoka Highway Dist.*, 61 Idaho 731, 737, 106 P.2d 1020, 1022 (1940); 41 Am.Jur.2d *Independent Contractors* § 3 (1995). Whether a person employed to do certain work is an independent contractor or an employee turns on the amount of control the employer reserves over the individual. *See Id.* Where an employer controls the performance of the person employed to do certain work, as well as the result to be achieved, the servant is an

---

2. Because we hold that the March 27 letter did not create an express warranty from State Farm to the Melichars, we need not address the Melic-

hars' concern as to whether the letter was part of their policy or a stand alone contract.

agent, and the employer will be liable for its authorized acts. *Id.* at 737, 106 P.2d at 1022. However, where the employer has no control over how the servant performs the contract, but retains control only as to the result to be achieved, the servant is an independent contractor. *Id.* The burden of proving a principal-agent relationship falls upon the party asserting agency. *Transamerica Leasing Corp. v. Van's Realty Co.,* 91 Idaho 510, 517, 427 P.2d 284, 291 (1967).

The evidence in the record establishes that State Farm lacked control over how Western performed the repairs of the Melichars' home. The only agreement between State Farm and Western states that "[t]he parties expressly agree that the Contractor shall be an independent contractor for all purposes in performance of this Agreement and that none of its employees or agents shall be considered an employee of State Farm for any purpose." Furthermore, representatives from State Farm testified that it did not control the work of Western, and one of Western's co-owners testified that State Farm did not control when it worked, nor did it ever direct Western's work. Given this evidence, the Melichars failed to establish that an agency relationship existed between State Farm and Western and, therefore, the district court did not err in granting State Farm's request that a directed verdict be entered against the Melichars with respect to breach the implied warranty of workmanship performance claim.

### D.

The district court awarded State Farm costs in the amount of $15,854.35 based upon the court's finding that State Farm was the prevailing party. The Melichars request on appeal that the district court's award of costs be vacated if the district court's holding is reversed. Because we affirm the district court, the Melichars' request is denied.

### E.

 Both parties request attorney fees on appeal. The Melichars request attorney fees pursuant to Idaho Code § 41–1839(1). Because State Farm has not failed to pay an amount "justly due," we decline to make an award. State Farm requests attorney fees on appeal pursuant to Idaho Code § 41–1839(4), which provides the authority for an award of attorney fees when a court finds that the case was "brought, pursued, or defended frivolously, unreasonably or without foundation." Idaho Code § 41–1839(4) provides a basis for an award of attorney fees to either the insured or the insurer. Nothing in the record suggests that this appeal was frivolous or unreasonable. Therefore, State Farm's request for attorney fees is denied.

### III.

The decision of the district court is affirmed. Neither party is awarded attorney fees on appeal. State Farm is entitled to costs on appeal.

Chief Justice SCHROEDER, and Justices TROUT, EISMANN and BURDICK concur.

152 P.3d 594

**Mike BLIMKA, Plaintiff–Respondent,**

v.

**MY WEB WHOLESALER, LLC., a Maine Limited Liability Company, and Lisa De Palma, Defendants–Appellants.**

No. 32185.

Supreme Court of Idaho,
Boise, October 2006 Term.

Jan. 29, 2007.

Bosch, Daw & Ballard, Chartered, Boise, for appellants. Les Bock argued.

Campbell & Walterscheid, LLP, Boise, for respondent. Matthew C. Campbell argued.

JONES, Justice.

This case concerns the exercise of personal jurisdiction by an Idaho court over non-resident defendants—a small Maine-based company and its manager—who utilized the internet to advertise and conduct business on a national scale. Mike Blimka, an Idaho resident, entered into an agreement with My Web Wholesalers, LLC ("My Web"), located in Maine, for a wholesale purchase of jeans. A dispute arose between the parties and Blimka initiated this action in Idaho. The district court found that it had personal jurisdiction over the defendants. We affirm.

## I.

My Web was a limited liability company formed under the laws of Maine and head-quartered in Athens, Maine, its sole place of business. It engaged in the selling of salvaged and distressed merchandise at wholesale. My Web maintained a website that provided information about the company and an automated "listserv" that periodically distributed emails containing My Web's offerings to its subscribers. My Web did not actively solicit customers; instead, customers learned of the company through searching the internet, seeing an advertisement in a national publication, or by word of mouth.

Blimka discovered My Web via the internet and subscribed to its listserv, whereby he received an email containing an offer for the sale of jeans in bulk. Blimka contacted My Web by phone to inquire about the offer and spoke with several of My Web's employees including Lisa DePalma, a Maine resident and My Web's manager. Over the course of the conversation with DePalma, the parties arrived at a deal for purchase of the jeans. My Web subsequently sent Blimka an invoice for 26,500 units of jeans at 79 cents per unit, plus shipping, totaling $20,935.00. In response, Blimka wired the funds to My Web and the jeans were shipped to Blimka in Idaho FOB California. Blimka claims that DePalma, as well as the email sent by My Web, represented that the jeans were of a certain quality and retail value. Blimka also claims to have been told that the jeans would be wrapped and shipped in a particular way.

Blimka received sixteen bales of jeans containing approximately 1,000 pairs each. Upon inspection, Blimka believed that these jeans did not conform to what My Web and DePalma had represented. He immediately called My Web and informed DePalma that he was rejecting the goods. A dispute arose and Blimka filed suit, initially naming My Web as a defendant and later amending his complaint to add DePalma as a defendant (collectively "defendants"). Blimka's complaint alleged fraud, breach of the implied warranty of merchantability, and breach of an express warranty. Blimka properly served the defendants in Maine; however neither filed an answer or a responsive pleading. The district court issued a default judgment against the defendants, holding that the court had personal jurisdiction and

that the defendants committed fraud, breached the implied warranty of merchantability, and breached an express warranty.

The defendants subsequently filed a special appearance and an Idaho R. Civ. P. 60(b)(4) motion for relief from the judgment, claiming it was void for want of personal jurisdiction. The district court denied the motion for relief on the grounds that jurisdiction was proper. The defendants appeal.

## II.

This opinion will address three issues: (1) whether the district court's exercise of personal jurisdiction over the defendants was proper under Idaho's long-arm statute; (2) whether the district court's exercise of personal jurisdiction over the defendants was consistent with the constitutional standards of the Due Process Clause of the U.S. Constitution; and (3) whether either party is entitled to attorney fees on appeal.

"The question of the existence of personal jurisdiction over an out-of-state defendant is one of law, which this Court reviews freely." *Knutsen v. Cloud*, 142 Idaho 148, 150, 124 P.3d 1024, 1026 (2005) (quoting *McAnally v. Bonjac, Inc.*, 137 Idaho 488, 491, 50 P.3d 983, 986 (2002)). A district court's decision whether to grant relief under the provisions of Idaho Rule of Civil Procedure 60(b) is a discretionary one that will not be disturbed on appeal in the absence of an abuse of discretion. *Watson v. Navistar Int'l. Transp. Corp.*, 121 Idaho 643, 651, 827 P.2d 656, 664 (1992).

## III.

The proper exercise of personal jurisdiction over non-resident defendants by an Idaho court involves satisfying two criteria. *McAnally*, 137 Idaho at 491, 50 P.3d at 986; *St. Alphonsus Reg'l Med. Ctr. v. State of Washington*, 123 Idaho 739, 742, 852 P.2d 491, 494 (1993). First, the court must determine that the non-resident defendant's actions fall within the scope of Idaho's long-arm statute. *McAnally*, 137 Idaho at 491, 50 P.3d 983. Second, the court must determine that exercising jurisdiction over the non-resident defendant comports with the constitu-

tional standards of the Due Process Clause of the U.S. Constitution. *Id.*

The district court held that its exercise of personal jurisdiction over the defendants was proper under Idaho's long-arm statute, Idaho Code § 5–514, which provides for the exercise of jurisdiction over claims arising out of a defendant's contacts with Idaho. *Western States Equip. Co., v. American Amex, Inc.*, 125 Idaho 155, 158, 868 P.2d 483, 486 (1994). Blimka argues that the district court properly exercised personal jurisdiction over the defendants with respect to the fraud claim pursuant to Idaho Code § 5–514(b), and with respect to the contract claims pursuant to Idaho Code § 5–514(a). Since we conclude that jurisdiction existed on the fraud claim, both with respect to My Web and DePalma, and because that claim supports all relief granted in the judgment, we need not address the issue of jurisdiction over the contract claims.

## A.

Idaho's long-arm statute extends jurisdiction to "[t]he commission of a tortious act within this state." I.C. § 5–514(b). This Court has held that "an allegation that an injury has occurred in Idaho in a tortious manner is sufficient to invoke the tortious act language of I.C. § 5–514(b)." *St. Alphonsus Reg'l Med. Ctr.*, 123 Idaho at 743, 852 P.2d at 495. This is remedial legislation designed to provide a forum for Idaho residents and should be liberally construed to effectuate that purpose. *Id.* Blimka alleges that the defendants committed the tort of fraud in Idaho by intentionally misrepresenting various aspects of the jeans and that he relied on those misrepresentations to his detriment. In response, the defendants cite *Akichika v. Kelleher*, 96 Idaho 930, 539 P.2d 283 (1975) in support of their argument that they did not commit a tortious act in Idaho because, at all times relevant to this suit, they were never physically present in Idaho and could not have acted within the state. This argument is unavailing.

*Akichika* involved an Idaho resident who bought a truck from an Oregon resident. The buyer brought suit for damages in Ida-

ho, claiming that the seller had misrepresented the truck. 96 Idaho at 931, 539 P.2d at 284. Although the buyer learned about the truck in Idaho and conversed by telephone from Idaho with the Oregon seller, the buyer traveled to Oregon to inspect the truck, purchased and took delivery of it there, and only learned of the problems allegedly constituting the fraud when it broke down in Oregon on the way back to Idaho. *Id.* at 932, 539 P.2d at 285. This Court held that jurisdiction did not exist under either I.C. § 5–514(a), since the seller was not transacting business in the State of Idaho, or I.C. § 5–514(b), because the alleged tortious act did not occur in Idaho. *Id.* at 933, 539 P.2d at 286.

While this case presents some similarities to *Akichika,* there are also differences, primarily with regard to the question of where the injury actually occurred. Blimka learned of the jeans through an internet contact with the defendants and discussed the attributes of the jeans through means of email and telephone contacts. Blimka alleges that the defendants directed misrepresentations to him in Idaho via electronic means and that he sustained injury when he took delivery of the jeans in Idaho, only then learning that they had been misrepresented.

After *Akichika* was decided, the U.S. Supreme Court issued two decisions wherein it placed substantial emphasis on providing a forum in a state where the victim suffers injury from tortious action directed toward that state. In *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) the Court held New Hampshire courts had jurisdiction over a libel action against an out-of-state defendant where injury was sustained by the victim within that state. The Court noted that "New Hampshire has a significant interest in redressing injuries that actually occur within the State." *Id.* at 776, 104 S.Ct. 1473. Similarly, in *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1486–88, 79 L.Ed.2d 804, 812–13 (1984), the Court held California courts could entertain a libel action against out-of-state defendants, where the tortious activity was directed at a California resident and the injury was felt within that state.

In this case, the allegedly fraudulent representations were directed at an Idaho resident and the injury occurred in this state. Thus, we hold that Blimka's allegation of fraud was sufficient to invoke the tortious acts language of Idaho Code § 5–514(b) with respect to both defendants.

**B.**

Next, the defendants contend that their contacts with Idaho were insufficient under the Due Process Clause of the U.S. Constitution to permit personal jurisdiction in this case. The Fourteenth Amendment to the U.S. Constitution permits a state to exercise personal jurisdiction over a non-resident defendant when that defendant has certain minimum contacts with the state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 101–02 (1945). In determining the existence of minimum contacts, a court must focus on the relationship among the defendant, the forum, and the litigation. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683, 697–98 (1977). Once a court finds the requisite minimum contacts, it must then proceed to determine whether its assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528, 543 (1985).

In this case, the district court found that minimum contacts existed and that the court's exercise of personal jurisdiction over the defendants comported with fair play and substantial justice. Blimka argues that the district court properly exercised personal jurisdiction over the defendants.

Blimka's complaint alleged that the defendants committed the intentional tort of fraud. In the *Calder* case, the U.S. Supreme Court distinguished "untargeted negligence" from intentional, and allegedly tortious, acts expressly aimed at the forum, and adopted an "effects" test to address what contacts are necessary to satisfy minimum contacts in the context of an intentional tort expressly aimed

at the forum state. There, the plaintiff, a California resident, alleged that Florida defendants committed the intentional tort of libel by circulating a libelous story they knew would injure the plaintiff. 465 U.S. at 784–85, 104 S.Ct. at 1484–85, 79 L.Ed.2d at 809–10. The Court held that minimum contacts were satisfied where the defendants allegedly committed the intentional tort of libel outside of the forum state, but the effects of the tort were directed to, and suffered in, the forum state. *Id.* at 789, 104 S.Ct. at 1486–87, 79 L.Ed.2d at 812.

■ Like the defendants in *Calder,* the defendants in this case were not charged with mere "untargeted negligence." Rather, they were charged with the commission of a fraud in Idaho. Blimka alleged that the defendants intentionally misrepresented facts regarding the quality, value, and packaging of the jeans during telephonic and electronic communications. At all times during the communications, the defendants knew that Blimka was residing in Idaho. Therefore, like the defendants in *Calder,* "their intentional, and allegedly tortious, actions were expressly aimed" at Idaho, and they realized that the brunt of the injury resulting from these actions would occur in Idaho. *Id.* at 789–790, 104 S.Ct. at 1486–88, 79 L.Ed.2d at 812–13. Where an Idaho resident alleges that a defendant in Maine intentionally directed false representations to, and caused injury in Idaho, that resident need not travel to Maine to pursue his or her claim against the perpetrator of the fraud. *See id.* The defendants' actions satisfy minimum contacts with respect to the fraud allegations.

Additionally, because the defendants purposefully directed their allegedly false representations into Idaho, the exercise of personal jurisdiction is presumed not to offend traditional notions of fair play and substantial justice. *See, e.g., Brainerd v. Governors of the Univ. of Alberta,* 873 F.2d 1257, 1260 (9th Cir.1989). Idaho has an ever-increasing interest in protecting its residents from fraud committed on them from afar by electronic means. Given the facts, the defendants should have reasonably anticipated being haled into Idaho courts. Because Blimka alleges that both My Web and De-Palma committed fraud, we hold that the district court's exercise of personal jurisdiction over the defendants with respect to the fraud claim comported with constitutional standards.

**C.**

In sum, neither the Idaho long-arm statute nor the Due Process Clause precluded the district court from exercising personal jurisdiction over the defendants and entering a binding judgment against them in this case. As a result, the district court's decision to deny the defendants' motion for relief from judgment was not an abuse of that court's discretion and will not be disturbed by this Court.

**IV.**

■ Both parties requests attorney fees on appeal pursuant to Idaho Code § 12–120(3), which compels an award attorney fees to the prevailing party in any civil action to recover "in any commercial transaction." Commercial transaction has been defined as "all transactions except transactions for personal or household purposes." I.C. § 12–120(3). An award of attorney fees under Idaho Code § 12–120(3) is proper if "the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover." *Brower v. E.I. DuPont De Nemours and Co.,* 117 Idaho 780, 784, 792 P.2d 345, 349 (1990).

■ A transaction involving the sale of 26,500 pairs of jeans is not made for personal or household purposes. Rather, it is a business or commercial transaction, as Blimka obviously intended to market the jeans rather than wear them. From time to time the Court has denied fees under I.C. § 12–120(3) on the commercial transaction ground either because the claim sounded in tort or because no contract was involved. The commercial transaction ground in I.C. § 12–120(3) neither prohibits a fee award for a commercial transaction that involves tortious conduct (*see Lettunich v. Key Bank Nat'l Ass'n,* 141 Idaho 362, 369, 109 P.3d 1104, 1111 (2005)), nor does it require that there be a contract. Any previous holdings to the contrary are

overruled. We hold that Blimka is entitled to a fee award on appeal with respect to his fraud claim, as he is seeking recovery of damages sustained as a result of the commercial transaction involved in this case.

## V.

We hold that the acts of the defendants were sufficient to subject them to the jurisdiction of the Idaho courts for the purpose of this litigation. The decision of the district court is affirmed. Blimka is awarded attorney fees and costs on appeal.

Chief Justice SCHROEDER, and Justices TROUT and BURDICK concur.

Justice EISMANN specially concurring.

I concur in the majority opinion except with respect to its attempt to distinguish *Akichika v. Kelleher*, 96 Idaho 930, 539 P.2d 283 (1975), from this case. In my opinion, *Akichika* is not distinguishable and should be overruled insofar as it held that there was no long-arm jurisdiction based upon the commission of a tort in Idaho.

The majority seeks to distinguish *Akichika* from this case based upon where the injury occurred. According to the majority, Blimka "sustained injury when he took delivery of the jeans in Idaho, only then learning that they had been misrepresented." The majority points out that Akichika took delivery of the pickup truck in Oregon and learned he had been defrauded when it broke down while he was driving back to Idaho. I cannot agree with the majority's analysis because it confuses the injury caused by the fraud with the discovery of the fraud. The majority is also mistaken as to where Blimka took delivery. The jeans were sold F.O.B. California, which means that Blimka took delivery in California. I.C. §§ 28–2–301; 28–2–319(1)(a); 28–2–401(2)(a); 28–2–503(2); & 28–2–504(a). He was responsible for transporting the jeans to Idaho, he bore the risk of loss once they left the point of shipment in California, and he paid the cost of shipping them.

Akichika suffered injury when he paid $1,000 for the misrepresented truck, not when he later learned he had been defrauded

after the truck broke down on his way back to Idaho. The money was taken out of his checking account in Homedale, Idaho. Likewise, Blimka suffered injury when he wired $21,000 to My Web Wholesaler, LLC, not when he later received the jeans and learned he had been defrauded. Blimka wants his money back from the defendants, not another shipment of jeans. Although learning of the fraud may injure one's sense of justice, that injury is not compensable. It is the injury to one's pocketbook that is compensable.

In both this case and *Akichika*, the fraudulent misrepresentations to induce the buyers to part with their money were made over the telephone by out-of-state sellers who were knowingly talking to prospective buyers located in Idaho. In both cases, the items being sold were existing goods. In both cases, the misrepresentations concerned the characteristics of those goods. In both cases the sellers misrepresented the goods in order to induce Idaho residents to purchase them. In both cases, the Idaho residents relied upon the misrepresentations and parted with money in order to obtain the goods. The only difference is that in *Akichika* the check representing the down payment was personally delivered to the out-of-state seller while in this case the payment was wired to the out-of-state seller. In my opinion, it does not matter whether the buyer thereafter physically delivered payment to the seller, mailed payment to the seller, or wired payment to the seller, the injury occurred in Idaho, and an Idaho court has jurisdiction.

The majority holds that there is long-arm jurisdiction in this case because: (1) "[a]t all times during the communications, the defendants knew that Blimka was residing in Idaho" and therefore " 'their intentional, and allegedly tortious, actions were expressly aimed' at Idaho"; (2) the defendants "realized that the brunt of the injury resulting from these actions would occur in Idaho"; and (3) "because the defendants purposefully directed their allegedly false representations into Idaho, the exercise of personal jurisdiction is presumed not to offend traditional notions of fair play and substantial justice." Those three factors also apply to the facts in *Akichika*.

The seller's intentional and tortious actions were expressly aimed at Idaho because the seller in *Akichika* made the fraudulent misreprentations during a telephone call with a prospective purchaser he knew was in Idaho. Likewise, the seller in *Akichika* knew that the brunt of the injury resulting from the transaction would occur in Idaho. The down payment was drawn on a bank located in Idaho, and the balance of the payment was to be made at that bank. Finally, in *Akichika*, just as in this case, "because the defendants purposefully directed their allegedly false representations into Idaho, the exercise of personal jurisdiction is presumed not to offend traditional notions of fair play and substantial justice."

*Akichika* and this case are indistinguishable based upon an analysis of the relevant facts and law. By failing to overrule it, we simply create confusion as to the applicable law.

152 P.3d 601

**Alan W. WILSON, Plaintiff–Appellant,**

v.

**J.R. SIMPLOT CO., Defendant–Respondent.**

No. 31774.

Supreme Court of Idaho,
Boise, January 2007 Term.

Jan. 30, 2007.

E. Lee Schlender, Mountain Home, for appellant.

Cantrill, Skinner, Sullivan & King, LLP, Boise, for respondent. Robert D. Lewis argued.

SCHROEDER, Chief Justice.

Alan W. Wilson appeals from an order granting a new trial on the ground of excessive damages appearing to have been given under the influence of passion or prejudice. The order granting the new trial is affirmed.

## I.

## FACTS AND PROCEDURAL HISTORY

On July 16, 2003, a cattle truck driven by an employee of the J.R. Simplot Company (Simplot) collided with a Toyota pickup being driven by Alan Wilson (Wilson). Wilson's primary injuries were a forehead laceration and a compression fracture of his T12 vertebra. He filed this action seeking to recover damages. Simplot admitted liability, and on November 30, 2004, the case went to trial on the issue of damages.

Wilson's forehead laceration had required several stitches. He testified at trial that it was "pretty well healed." In 1983 Wilson had fractured his L1 vertebra in an automobile accident. The fracture had been repaired by fusing together his T12, L1, and L2 vertebrae. The 2003 accident did not break that fusion, but the fusion did put more stress on his fractured T12 vertebra. The fracture was treated with a body brace to stabilize the spine while it healed. Wilson could remove the brace for bathing and sleeping. The fracture had healed by February 2004, and he was permitted to stop using the brace. Wilson testified at trial that he was still experiencing some pain from the fracture, but he was not taking any medications for the pain. His orthopedic surgeon testified that it usually took a year or two to see whether such pain was permanent. The surgeon could not opine that the fracture at T12 would cause any future medical problems.

After a two-day trial, the jury returned its verdict awarding Wilson $15,400 in economic damages and $250,000 in non-economic damages. The economic damages included his medical expenses and property damage. The district court entered a judgment in conformity with the verdict.

Simplot moved for a judgment n.o.v., or in the alternative a new trial, or in the alternative a remittitur. The motion for a new trial alleged that the damages were excessive and appeared to have been given under the influence of passion or prejudice and that there was an insufficiency of the evidence to justify the damages. The district court denied the motion for judgment n.o.v. and declined to grant a remittitur. It did, however, grant the motion for a new trial on the ground that the non-economic damages were excessive and appeared to have been given under the influence of passion or prejudice. Wilson appealed.

## II.

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING A NEW TRIAL

In *Dinneen v. Finch*, 100 Idaho 620, 625–26, 603 P.2d 575, 580–81 (1979) (emphasis in original; citations omitted), the Court stated:

Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive "as a matter of law." Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial.

"This Court will not reverse a trial court's order granting or denying a motion for new trial 'unless the court has *manifestly* abused the wide discretion vested in it.'" *Myers v. Workmen's Auto. Ins. Co.*, 140 Idaho 495, 506, 95 P.3d 977, 988 (2004) (quoting *Quick v. Crane*, 111 Idaho 759, 770, 727 P.2d 1187, 1198 (1986)) (emphasis in original).

In its memorandum opinion the district court stated that at the conclusion of oral arguments it "made notes to itself that an award in excess of $100,000 would warrant a new trial. Those notes were based upon the Court's perception that a larger verdict would have been the result of passion or prejudice on the part of the jury." Wilson argues that the district court granted a new trial simply because the jury's award "was more than the Judge would have awarded." However, the district court's opinion indicates that it gave substantial weight to the jury's verdict:

> The Court's decision to overturn the jury's verdict was not lightly reached. Our jury system is deserving of respect, and a judge should not readily substitute its opinion or damage award for that of a jury. Despite this Court's views during trial as to the figure that would trigger a new trial, this Court has wrestled with the subjective question of whether this Court is simply substituting its determination of the measure of damages for that of the jury. This Court's respect for the jury process has made difficult an otherwise easy decision.

■ The district court observed that the jury may have been prejudiced against the defendant which is a large corporation and commented that statements by Wilson's counsel as to the type of damages that might be appropriate if the defendant's founder had been injured may have aroused the passions of the jury. Wilson argues that there is no evidence in the record of any actual passion or prejudice. In *Dinneen v. Finch*, the Court stated "It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient." 100 Idaho at 625–26, 603 P.2d at 580–81. If the trial court's determination of damages is so

substantially different from that of the jury that it can only explain this difference as resulting from passion or prejudice on the part of the jury against a party, the trial court should grant a new trial. *Quick*, 111 Idaho 759, 727 P.2d 1187. In this case the district court found, "[T]he Court does not hesitate to say that the size of the verdict shocked the Court. The excessively large award can only be explained as resulting from passion or prejudice."

■ Wilson argues that the amount awarded by the jury was only "slightly more than twice what the Court would have awarded in a bench trial." However, the district court did not say it would award $100,000. Rather, that was the maximum award that could be awarded in the absence of passion or prejudice. "How substantial this difference must be [between the jury's award and the trial judge's determination of damages] is impossible to formulate with any degree of accuracy. It will necessarily vary with the factual context of each case and the trial judge's sense of fairness and justice." *Quick*, 111 Idaho at 769, 727 P.2d at 1197. The difference in this case is large enough that the district court could reasonably determine that the damages were so excessive that they appeared to have been given under the influence of passion or prejudice.

Wilson has failed to show that the district court abused its discretion in granting the motion for a new trial.

### III.

### CONCLUSION

The order granting a motion for a new trial is affirmed. The respondent is awarded costs on appeal.

Justices TROUT, BURDICK and JONES and Justice Pro Tem WALTERS concur.

152 P.3d 604

Rodney GRIFFITH and Carla Griffith, husband and wife, individually and dba Boswell Farms, Plaintiffs-Counterdefendants-Respondents-Cross Appellants,

v.

CLEAR LAKES TROUT CO., INC., an Idaho corporation, Defendant–Counterclaimant–Appellant–Cross Respondent.

No. 32385.

Supreme Court of Idaho,
Twin Falls, November 2006 Term.

Jan. 31, 2007.

Ringert Clark Chartered, Boise, for appellant. James G. Reid argued.

Robertson, Hepworth, Slette, Worst & Stover, Twin Falls, for respondents. Jeffrey J. Hepworth argued.

SCHROEDER, Chief Justice.

This is a dispute between Clear Lakes Trout Co., Inc. and Rodney and Carla Griffith concerning enforceability of an agreement to provide "market size" fish, a term subject to interpretation. Also at issue is whether the damages awarded by the district court were sufficiently proved, and whether the district court's award of attorney fees was proper.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Clear Lakes Trout Co., Inc. ("Clear Lakes"), which operates a fish hatchery, entered into an arrangement with Rodney and Carla Griffith, d/b/a Boswell Farms ("Griffith"), a trout grower, under which Griffith would purchase small trout from Clear Lakes and sell them back when they had grown to "market size." The parties did business on a casual basis prior to September 1998, at which point they executed an Agreement that is the subject of this dispute. Under the Agreement Clear Lakes agreed to sell Griffith "small trout" in sufficient quantities to allow Griffith to grow "up to two million pounds live weight" each year. Griffith would then sell the trout back to Clear Lakes "when the trout are grown to market size." The small trout were priced according to a local index, and the market size trout were sold at a set rate per pound. Payment for the small trout was not due until they were resold to Clear Lakes at market size, at which point the payment to Griffith would be partially offset by the amount due Clear Lakes. The Agreement was to last six years from September 1998 to September 2004, and provided for the "market size" price to be renegotiated after the second and fourth years.

The parties performed satisfactorily from September 1998 to September 2001. After September 11, 2001, however, the market for trout changed significantly as Clear Lakes' customers began to demand larger size fish. As the market for the 12 to 16 ounce fish produced by Griffith began to dry up Clear Lakes began taking deliveries much later and in smaller loads, leaving Griffith with overcrowded ponds and tightened cash flow.

By 2002 Griffith was experiencing financial difficulties and told Clear Lakes they were "going to have a wreck" because of the slowdown in volume. Clear Lakes promised to "do a better job" and work with the Griffiths. The parties agreed to extend the term of the contract for one year to 2005. The problems worsened during the succeeding year. At some point Clear Lakes offered to pay $125,000, plus let Griffith sell the remaining fish on hand, but Griffith faced nearly $600,000 in debt and was doubtful that it could find a market for the fish any better than Clear Lakes could. Consequently Griffith rejected the offer. Clear Lakes ultimately took delivery of the remaining fish and sold them to a mink farm for almost nothing, reflecting that there was little or no market for the trout at that time. Griffith refused to take a further shipment of small trout from Clear Lakes, and the contract was terminated near the end of the fifth year in August 2003.

Griffith filed suit in September 2003, alleging that Clear Lakes had breached the contract "by refusing to accept and purchase in a timely manner the trout that the Griffiths had grown to market size." Griffith alleged the delays and overly frequent harvests resulted in overcrowded conditions, reduced water quality, and increased stress on the fish, which in turn required increased expenditures for feed and labor and caused excessive mortality losses. The reduced capacity to restock ponds further strained Griffith's cash flow. Clear Lakes counterclaimed for amounts owing on several shipments of small trout that had not been settled.

Clear Lakes moved for summary judgment, claiming that no contract was ever formed because the parties held fundamentally different interpretations of "market size." Clear Lakes claims "market size" varies according to whatever its customers demand, whereas Griffith asserts the term has a more static definition and refers to fish approximating one pound live weight. Griffith also filed a cross motion for summary judgment on the issue of breach based on its interpretation of "market size." The district court denied both motions and held a court trial in March 2005.

The district court found that the parties intended "market size" to refer to fish approximating one pound live weight, and that Clear Lakes had breached its duty to take timely deliveries under the contract. The district court awarded Griffith damages for its lost profits during the fourth and fifth years of the contract (September 2001 to September 2003) based on the increased cost

of producing fish and the increased mortality losses. It refused to grant lost profits based on additional fish that could have been raised during those years, as well as during the remaining years of the contract (September 2003 to September 2005), finding that the potential for raising additional fish was too speculative to support an award of damages.

Clear Lakes appeals, arguing that no contract was ever formed and that Griffith's damages were not proved to a reasonable certainty. It also contests the district court's award of attorney fees to Griffith. Griffith cross appeals, arguing that the district court should have granted lost profit damages for additional fish that could have been raised during the last two years of the contract. Both parties request attorney fees on appeal.

## II.

## STANDARD OF REVIEW

■ The review of a trial court's decision after a court trial is limited to ascertaining "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Idaho Forest Industries, Inc. v. Hayden Lake Watershed Imp. Dist.*, 135 Idaho 316, 319, 17 P.3d 260, 263 (2000). The trial court's findings of fact will not be set aside unless clearly erroneous. *Id.*; *see* I.R.C.P. 52(a). Thus, if the findings of fact are supported by substantial and competent evidence, even if the evidence is conflicting, this Court will not disturb those findings. *Idaho Forest Industries, Inc.*, 135 Idaho at 319, 17 P.3d at 263. In view of the trial court's role to weigh conflicting evidence and testimony and to judge the credibility of witnesses, the trial court's findings of fact will be liberally construed in favor of the judgment entered. *Sun Valley Shamrock Resources, Inc. v. Travelers Leasing Corp.*, 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990). In reviewing a trial court's conclusions of law, however, a different standard applies: this Court is not bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented. *Idaho*

*Forest Industries, Inc.*, 135 Idaho at 319, 17 P.3d at 263.

*Indep. Lead Mines Co. v. Hecla Mining Co.*, 143 Idaho 22, 26, 137 P.3d 409, 413 (2006).

## III.

## THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT A VALID CONTRACT WAS FORMED

■ Generally the presence of an ambiguous term in a contract document presents an issue of interpretation, requiring the trier of fact to determine the intent of the parties. *Indep. Lead Mines*, 143 Idaho at 26, 137 P.3d at 413; *Elec. Wholesale Supply Co. v. Nielson*, 136 Idaho 814, 822–23, 41 P.3d 242, 250–51 (2001). In some cases, however, parties attribute such different meanings to the same term that there has been no "meeting of the minds" which is necessary for contract formation. *See Barry v. Pac. West Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004). An agreement that is so vague, indefinite and uncertain that the intent of the parties cannot be ascertained is unenforceable, and courts are left with no choice but to leave the parties as they found them. *Barnes v. Huck*, 97 Idaho 173, 178, 540 P.2d 1352, 1357 (1975).

■ According to *Barnes*, "The law does not favor, but leans against, the destruction of contracts because of uncertainty...." *Id.* Mere disagreement between the parties as to the meaning of a term is not enough to invalidate a contract entirely; the applicable standard is reasonable certainty as to the material terms of a contract, not absolute certainty relative to every detail. *Id.* Under the Uniform Commercial Code, "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." I.C. § 28-2-204(3). Thus, "[i]n order to have an enforceable contract, the UCC does not require a document itemizing all the specific terms of the agreement. Rather, the UCC requires a determination whether the circumstances of the case, including the parties' conduct, are 'sufficient to show agreement.'" *Paloukos v. Intermountain Chevrolet Co.*, 99 Idaho 740, 743,

588 P.2d 939, 942 (1978). Whether the parties intended to form a contract is a question of fact to be determined by the trier of fact. *See Barry,* 140 Idaho at 832, 103 P.3d at 445 (upholding trial court's finding that there was a meeting of the minds because there was evidence in support); *Paloukos,* 99 Idaho at 743, 588 P.2d at 942 (reversing a grant of summary judgment because the alleged facts could support a conclusion by the trier of fact that the parties intended to enter a binding contract under I.C. § 28–2–204).

Clear Lakes urges that this case is similar to *Raffles v. Wichelhaus* ("the *Peerless* case"), 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), in which an agreement to ship cotton aboard the "Peerless" was held unenforceable because there were in fact two different ships by that name unbeknownst to the parties, and each party was referring to a different ship. Clear Lakes argues that its interpretation of the term "market size" was so drastically different from Griffith's understanding that they cannot be said to have had a meeting of the minds. According to Clear Lakes, Griffith understood the term to refer to a static measure approximating 12 to 16 ounces in size, whereas Clear Lakes intended the term to refer to Clear Lakes' own downstream market, which could vary substantially over time according to the preferences of its customers, within a range from 12 to 50 ounces. The parties' expectations were relatively compatible during the first three years of the contract because Clear Lakes' customers were demanding the smaller fish that could be used for frozen fillets. After September 2001, however, the market for frozen products declined and the needs of Clear Lakes' customers shifted to require larger fish, and the parties' allegedly different interpretations became apparent.

In summary judgment proceedings the district court held that any disagreement between the parties regarding "market size" was not so fundamental as to "go to the heart of the very essence of the contract." Following trial the district court found that Clear Lakes and Griffith did not actually disagree as to the meaning of "market size" at the time of formation of the contract.

1. **Substantial evidence supports the district court's finding that any difference of interpretation as to the term "market size" did not defeat contract formation.**

■ The district court found that "[t]he parties undoubtedly intended to make a contract and there is a 'reasonably certain basis for giving an appropriate remedy.'" The district court's statement is consistent with I.C. § 28–2–204(3):

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Substantial evidence supports the district court's conclusion. The fact that the parties' interpretations coincided during the first three years of the contract is persuasive. *See* Restatement (Second) of Contracts § 20, reporter's note (1981) (suggesting that a contract should be held nonexistent only where the disputed term "could have either but not both meanings"). The district court also placed weight on the course of negotiation and the prior course of dealing. Again these are persuasive facts supporting the district court's conclusion.

2. **Substantial evidence supports the district court's finding that the parties did not disagree as the meaning of the term "market size."**

■ The district court found that at the time of contract formation "Clear Lakes and Griffith had an understanding about what fish were 'market size.'" Specifically, "as between Griffiths and Clear Lakes, the term is suggestive of a trout approximating one pound as the parties had considered it over the years." This finding is significant in determining whether Clear Lakes breached and negates the contention that there was no meeting of the minds as to the meaning of the term.

The district court found that the course of performance between the parties over the first three years of the contract, as well as their course of dealing prior to executing the Agreement, confirmed that the parties in-

tended market size to indicate trout approximating one pound live weight. Griffith also presented evidence of similar trade usage predating the contract.

The Agreement itself, construed as a whole, also contained indications that parties' understandings were consistent with each other. The Agreement states:

> Harvesting of a crop or lot is typically done in two procedure [sic] or harvests. The first harvest is the larger or market size trout and the second harvest is done later after the smallest trout continue to grow and reach market size.

Both parties agreed it was in their interest to have "continuous and uniform delivery" each month. The district court found that these terms were inconsistent with the notion that market size might vary dramatically, since altering the required size might entail varying the delivery schedule and increasing the number of harvests.

Finally, the district court found that Clear Lakes' delivery requests never specified a certain size of fish, but merely specified a total weight for each load. Clear Lakes never explicitly ordered Griffith to grow larger fish except on one special occasion when it provided a different kind of fish for that purpose and Griffith agreed to make special arrangements to accommodate the request.

The evidence cited by the district court is sufficient to support its finding that both parties understood the term "market size" to refer to a fixed range approximating one pound live weight.

## IV.

## THE COURT WILL NOT DISTURB THE DISTRICT COURT'S CONCLUSION THAT CLEAR LAKES BREACHED THE CONTRACT

■ Clear Lakes argues that even if there was a contract, it did not require Clear Lakes to buy fish from Griffith at specified times. According to Clear Lakes, the district court's finding that the contract required delivery within a certain time and required two harvests is unsupportable, since even Griffith agreed that the Agreement contained no language specifying a period of time within which Clear Lakes must buy back the fish. More generally, Clear Lakes argues that its definition of "market size" is the correct one.

The district court found that the language regarding the "typical" number of harvests and the need for "continuous and uniform delivery" were sufficient to indicate an implied obligation to take deliveries within a reasonable time and with limited frequency. There is evidence supporting the district court's findings regarding the delivery schedule contemplated by the parties and Clear Lakes' failure to adhere to it.

## V.

## THE DISTRICT COURT'S FINDINGS REGARDING LOST PROFIT DAMAGES WERE NOT CLEARLY ERRONEOUS

The district court found that Griffith was injured by Clear Lakes' failure to "timely accept delivery of the trout according to the terms of the contract." The delays forced Griffith to continue feeding and caring for the fish beyond the time when Clear Lakes should have taken delivery. Griffith also continued to bear the risk of loss, which was significant because the overcrowded conditions and increased frequency of harvests put more stress on the fish and resulted in higher mortality rates than in previous years. In addition to these direct costs, Griffith failed to realize the profits from additional fish it would have raised but for the reduced capacity and increased financing costs occasioned by Clear Lakes dragging out the process. Finally, Griffith failed to realize the profits it would have earned during the remaining two years of the contract had it not been terminated prematurely.

The district court granted lost profit damages for the increased cost of raising fish during years four and five of the contract. It also granted damages for increased mortality losses during the same period. It refused to grant damages for fish not raised, finding that the potential of raising additional fish was too speculative to support an award of damages. Griffith's award was offset by

amounts owed to Clear Lakes for small trout delivered under the contract. The district court amended its judgment with respect to the offsets, but it refused to alter its conclusion that the prospect of raising additional fish was overly speculative.

 "A district court's award of damages will be upheld on appeal where there is sufficient evidence supporting the award." *Sells v. Robinson,* 141 Idaho 767, 774, 118 P.3d 99, 106 (2005) (citing *Bumgarner v. Bumgarner,* 124 Idaho 629, 641, 862 P.2d 321, 333 (Ct.App.1993)). The evidence is sufficient if it proves the damages with reasonable certainty. *Inland Group of Companies v. Providence Washington Ins. Co.,* 133 Idaho 249, 257, 985 P.2d 674, 682 (1999) (citing *Hummer v. Evans,* 129 Idaho 274, 280, 923 P.2d 981, 987 (1996)) ("Compensatory damages for lost profits and future earnings must be shown with a reasonable certainty."). Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation. *Fuller v. Wolters,* 119 Idaho 415, 422, 807 P.2d 633, 640 (1991) (quoting *Big Butte Ranch, Inc. v. Grasmick,* 91 Idaho 6, 10, 415 P.2d 48, 52 (1966)). Ultimately it is for the trier of fact to fix the amount by determining the credibility of the witnesses, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *Sells,* 141 Idaho at 774, 118 P.3d at 106 (quoting *Bumgarner,* 124 Idaho at 640, 862 P.2d at 332).

### 1. Increased cost of raising fish during years four and five.

Griffith presented testimony from its accountant, Dan Deagle, CPA, who had over twenty years of experience working with fish farmers and processors in the area. Deagle estimated the "increased cost" to raise fish by calculating the average cost per pound for years two and three, which he then used as a baseline against which he could compare year four and year five. Deagle excluded year one from the baseline calculation because he "did not have sufficient accounting information to make accurate comparisons with that year."

Deagle calculated a cost per pound of 50 cents in year two and 56 cents in year three, resulting in an average cost per pound of 53 cents, which he used as the baseline. He corroborated this number with a report by Rick Eggleston, a fish farm appraiser, who had concluded that the cost to raise fish at another farm in the area was 54.5 cents. The year four cost was 68 cents and year five was 84 cents. Multiplying the difference in cost by the number of pounds sold resulted in a damage estimate of $164,000 for year four and $271,000 for year five.

Clear Lakes asserts that no competent evidence was submitted show a causal connection between the increased costs and the length of time Griffith was required to hold the fish and that the baseline cost calculation was skewed because year one, in which Griffith's costs amounted to 95 cents per pound, was excluded, such that only the two lowest-cost years were relied upon.

### a. Causation.

 The burden is upon the plaintiff to prove not only that it was injured, but that its injury was the result of the defendant's breach; both amount and causation must be proven with reasonable certainty. *See Magic Valley Truck Brokers, Inc. v. Meyer,* 133 Idaho 110, 116, 982 P.2d 945, 951 (Ct.App. 1999); *cf. Gillingham Constr. v. Newby–Wiggins Constr., Inc.,* 142 Idaho 15, 26, 121 P.3d 946, 957 (2005) (upholding award of damages where plaintiff presented substantial evidence of causation). Clear Lakes asserts that Deagle never performed an analysis to tie the increased costs to any specific cause and that he failed to analyze a number of other variables that might contribute to variations in the costs, including changes in the number of employees or in their salary levels; changes in insurance rates; changes in the price of feed and fuel; specific items of repair and maintenance; and so forth. In the absence of any breach the cost increased by 6 cents between years two and three, but Deagle was unable to determine precisely why the cost went up during that period. According to Clear Lakes, such unexplained variations cast doubt on the assumption that

the increased costs during years four and five were caused by the breach.

The fact that Deagle did not analyze every potential alternative cause is not fatal to Griffith's claim. He testified, and the district court agreed, that one would expect expenses to go up when the fish are kept for longer periods of time. Griffith was required to feed and care for the fish even after they had reached market size, often placing them on maintenance feed designed to maintain weight rather than add it. Keeping the fish for a longer period of time without adding any weight increased the cost per pound of the fish produced. Rodney Griffith testified that it cost more for labor, feed, and fuel to keep the fish the extra time. The district court was entitled to draw reasonable inferences from the evidence. It determined that any increase in costs over the base years was more likely than not attributable to Clear Lakes' delays in taking delivery. The evidence was sufficient to justify the district court's inference of causation, and Clear Lakes presented no evidence to the contrary.

 Griffith claimed, and the district court apparently agreed, that Deagle's analysis was the only analysis that could be done under the circumstances. "The mere fact that it is difficult to arrive at exact amount of damages, where it is shown that damages resulted, does not mean that damages may not be awarded...." *Sells*, 141 Idaho at 774, 118 P.3d at 106 (quoting *Bumgarner*, 124 Idaho at 640, 862 P.2d at 332). "Compensatory damages ... have to be proved with whatever definiteness and accuracy the facts permit, but no more." I.C. § 28–1–106 cmt. 1. The district court noted that Deagle's analysis did not take account of every factor that might influence costs but found it was still sufficient to provide a reasonably certain estimate of the damages:

> Again, even considering Clear Lakes' dispute with Deagle's numbers, I determine that Deagle's numbers are realistic given the delays in harvest and the Griffiths' maintaining fish in the ponds for extended periods of time. Deagle's numbers are also more sensible when coupled with [the Griffiths'] testimony that they were suffer-

ing significant cash flow problems in 2003....

The district court's conclusion that Deagle's analysis went beyond speculation is supported by the evidence and is consistent with the principle that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Smith v. Mitton*, 140 Idaho 893, 900, 104 P.3d 367, 374 (2004).

### b. Failure to include year one in the baseline calculation.

 According to Clear Lakes, if year one had been averaged in with years two and three the baseline cost would have been much higher, greatly reducing or even eliminating the damages claimed in years four and five. However, Deagle explained he was unable to produce a reliable cost estimate for year 1 because he lacked sufficient accounting information. The figure of 95 cents claimed by Clear Lakes to represent Griffith's year one costs apparently was taken from Deagle's spreadsheet but did not represent Deagle's opinion. It comes from applying the same formulas to the year one information as were applied to the other years, the difference being that the year one information was incomplete. Deagle testified that Griffith indicated there were other harvests during that year for which he (Deagle) had not received the records. Because he did not have an accurate amount of pounds of fish raised, he could not come up with an accurate cost-per-pound figure. Moreover, because he knew the figure for pounds raised was inaccurate he did not perform any more testing of the cash flow figures, and therefore the cash flow information was also erroneous. Deagle entered what information he had, but the resulting "cost" is meaningless. Clear Lakes presented no evidence of year one costs other than Deagle's estimate.

Regardless of whether the 95 cents figure claimed by Clear Lakes is valid, Clear Lakes claims the district court's conclusion was premised upon an incorrect assumption. Specifically, it argues, the district court thought Deagle's baseline cost of 53 cents was the average cost for the first three years of the contract, whereas year one had actually been excluded, and only the two lowest cost years had been used. Clear Lakes

points to the district court's statement in its Conclusions of Law that "Clear Lakes' breach damaged Griffiths financially by increasing their cost to produce fish from 53¢ per pound the first three years of the contract to 68¢ the fourth year and 84¢ the fifth year."

Contrary to Clear Lakes' argument, the record reflects that the district court knew where the baseline cost calculation came from. Several pages of the district court's Findings of Fact are devoted to discussing Deagle's cost figures for each year from year two to year five. The district court specifically recognized and rejected the adjustments proposed by Clear Lakes for years two and three and explained in detail the average cost calculation performed by Deagle. Its reference to "the first three years of the contract" is not inconsistent. Under Deagle's analysis, years two and three were intended to be representative of the entire pre-breach contractual period, including year one. The district court could reasonably find that the average of years two and three was representative of year one. Clear Lakes' allegation that Griffith purposely threw out the bad year goes to weight, not competence; the district court was entitled to believe Griffith. The district court's findings are supported by evidence.

### 2. Mortality losses during years four and five.

 Clear Lakes' breach resulted in overcrowded conditions, reduced water quality, and increased frequency of harvests. Rodney Griffith testified that all of these conditions placed added stress on the fish and resulted in higher mortality losses than would have occurred with timely deliveries. Griffith historically experienced a mortality loss in the range of 1% to 2%. The year four mortality loss, however, was 8.78%, and year five was 7.2%. The district court noted, "Mr. Johnson agreed that Griffith was a good operator and raised a good product; nothing else in the record provides an alternative for these losses, other than the delays brought on by Clear Lakes." The district court awarded damages for lost profits due to increased mortality loss, calculated as the excess of actual mortality loss over the historical high level of 2%. The resulting damages totaled approximately $37,000.

Rodney Griffith testified that he was required to keep the fish off feed for two to three days before harvesting, which would cause fish to die or lose weight. The natural consequence of taking fish in smaller loads with greater frequency is to amplify the adverse effect on the fish. This observation is not speculation. He also testified that in overcrowded conditions the fish would become stressed and often quit eating. The district court was entitled to believe his testimony and draw reasonable inferences from it.

## VI.

## DAMAGES SHOULD HAVE BEEN AWARDED FOR YEARS SIX AND SEVEN

 Griffith claims it should have been awarded damages for additional fish it could have raised during the last two years of the contract, maintaining that the probable per-pound profit was readily ascertainable since the cost had been established through Deagle's estimates and the price had been set under the contract. The district court found that any determination of how many fish would have been grown during the remaining years of the contract was too speculative to support an award of damages.

Griffith disputes the district court's finding that future volume was overly speculative, pointing to the fact that Deagle did produce an estimate of future profits based on the assumption that future volume would accord with the historical average. The decline in the market, among other factors, may have rendered the historical averages questionable for determining future quantities.

Griffith also makes the argument that the quantity is not uncertain as a matter of law where an output contract is involved. The contract required Clear Lakes to sell to Griffith enough trout to produce "up to two million pounds live weight for each year," which Clear Lakes was then obligated to purchase back at market size. Idaho Code

§ 28–2–306(1) dealing with output contracts provides the following:

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

While damages may be difficult to determine it is clear that the Clear Lakes breach deprived Griffith of the opportunity to complete performance of the contact for the remaining years and that losses for those years occurred. Consequently that portion of the decision of the district court is vacated and the case remanded to determine damages for years six and seven.

## VII.

### ATTORNEY FEES

■ Clear Lakes claims that Griffith was not the prevailing party below. The fact that they recovered less than they initially requested does not keep them from being a prevailing party. Clear Lakes' counterclaim does not change the outcome. The amounts recovered by Clear Lakes were offsets against the amounts that they were obligated to pay Griffith. Recognition of these amounts does not prevent Griffith from being a prevailing party. The district court's grant of attorney fees to Griffith under I.C. § 12–120(3) is affirmed.

As the prevailing party on appeal, Griffith is also entitled to reasonable attorney fees on appeal. I.C. § 12–120(3).

## VIII.

### CONCLUSION

The decision of the district court is affirmed in part and vacated in part as outlined in this decision. The case is remanded for the determination of damages for years six

and seven of the contract. Griffith is awarded costs and attorney fees on appeal.

Justices TROUT, EISMANN, BURDICK and JONES concur.

152 P.3d 614

**Rena PARSONS, Plaintiff–Respondent,**

v.

**MUTUAL OF ENUMCLAW INSURANCE COMPANY, Defendant–Appellant.**

**No. 32603.**

Supreme Court of Idaho,
Boise, January 2007 Term.

Feb. 2, 2007.

744

Cantrill, Skinner, Sullivan & King, LLP, Boise, for appellant. Clinton O. Casey argued.

Holzer, Edwards & Harrison, Boise, for respondent. Kurt D. Holzer argued.

EISMANN, Justice.

This appeal challenges the reasonableness of the award of attorney fees to an insured pursuant to Idaho Code § 41–1839. The insurer contends that the district court abused its discretion in awarding attorney fees in an amount consistent with the contingent fee agreement rather than in an amount based upon an hourly fee. We affirm the district court.

## I. FACTS AND PROCEDURAL HISTORY

On or about August 19, 2002, Rena Parsons (Parsons) was injured in an automobile

collision caused entirely by the negligence of another driver. The other driver had an insurance policy with liability limits of $50,000 issued by Allstate Insurance Company (Allstate). Parsons was covered by an insurance policy issued by Mutual of Enumclaw Insurance Company (Mutual of Enumclaw) and which provided $100,000 in underinsured motorist coverage.

Parsons filed suit against the other driver, and Allstate ultimately tendered the policy limits of $50,000. Mutual of Enumclaw authorized Parsons to accept that payment.

Parsons contended that her damages exceeded the limits of liability coverage under the Allstate policy. On September 21, 2004, Parsons, through her counsel, submitted a letter to Mutual of Enumclaw requesting that it pay "the amount justly due" under her underinsured motorist coverage. Her counsel did not specify an amount Parsons claimed was justly due, but simply stated that it exceeded the policy limits of the underinsured motorist coverage. A copy of Allstate's file regarding the accident was enclosed with the letter.

Mutual of Enumclaw submitted Parsons's medical records from the Allstate file to a corporation engaged, among other things, in the business of reviewing liability injury claims. After reviewing Parsons's medical records, the corporation sent Mutual of Enumclaw a letter dated October 25, 2004. The primary issue addressed in that letter was whether Parsons's surgical fusion at C5–6 and C6–7 done one week after the accident was related to the accident or to pre-existing degenerative changes. The letter stated, "It seems more difficult to make a case indicating the surgery wasn't related to the accident than to make a case indicating it was related to the accident." It recommended certain additional investigation, however, to be more certain that the surgery was related to the accident.

On October 26, 2004, Parsons filed this lawsuit against Mutual of Enumclaw seeking to recover "the amount justly due" under the underinsured motorist coverage together with costs and attorney fees pursuant to Idaho Code § 41–1839. Parsons served the complaint and summons the next day. On November 12, 2004, Mutual of Enumclaw tendered $60,000 to Parsons, which she accepted as the full payment of her personal injury claim under the underinsured motorist coverage.

On October 3, 2005, Parsons filed a motion seeking an award of attorney fees pursuant to Idaho Code § 41–1839. The district court awarded her attorney fees in the amount of $20,000, and Mutual of Enumclaw appealed.

## II. ISSUES ON APPEAL

1. Did Parsons fail to provide an adequate proof of loss?
2. Should we revive the rule announced in *Carter v. Cascade Insurance Company* and hold that an insured cannot recover attorney fees under Idaho Code § 41–1839 unless there is evidence that the insurer acted unreasonably or unjustly in failing to pay the amount justly due within thirty days after receiving the proof of loss?
3. Did the district court abuse its discretion in awarding attorney fees?
4. Is Parsons entitled to an award of attorney fees on appeal?

## III. ANALYSIS

Mutual of Enumclaw raises three issues on appeal. For the reasons stated below, we will not address the first two issues and will only address the third.

### A. Did Parsons Fail to Provide an Adequate Proof of Loss?

■ Idaho Code § 41–1839(1)[1] provides that an insurer is liable for attorney fees in an action brought by its insured to recover under the policy if the insurer failed to pay the amount justly due to its insured "for a period of thirty (30) days after proof of loss has been furnished as provided in such policy." Mutual of Enumclaw alleges on appeal that the proof of loss provided it by Parsons was not sufficient to comply with Idaho Code § 41–1839(1).

---

1. The statute provides:

 Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever, which shall fail for a period of thirty (30) days after proof of loss has been furnished as pro-

Mutual of Enumclaw did not raise in the trial court the issue of whether Parsons had submitted an adequate proof of loss. "The longstanding rule of this Court is that we will not consider issues that are raised for the first time on appeal." *Murray v. Spalding*, 141 Idaho 99, 101, 106 P.3d 425, 427 (2005). We have made an exception for constitutional issues if their consideration is necessary for subsequent proceedings in the case. *Id.* That exception does not apply here. We therefore decline to address this issue.

**B. Should We Revive the Rule Announced in *Carter v. Cascade Insurance Company* and Hold that an Insured Cannot Recover Attorney Fees Under Idaho Code § 41–1839 Unless There Is Evidence that the Insurer Acted Unreasonably or Unjustly in Failing to Pay the Amount Justly Due within Thirty Days after Receiving the Proof of Loss?**

In *Carter v. Cascade Insurance Company*, 92 Idaho 136, 140, 438 P.2d 566, 570 (1968),

we added to Idaho Code § 41–1839 a requirement that "there must be evidence that an insurer has acted unreasonably or unjustly before a court may award attorney's fees under I.C. § 41–1839." Five years later in *Associates Discount Corp. of Idaho v. Yosemite Insurance Co.*, 96 Idaho 249, 257, 526 P.2d 854, 862 (1973), we overruled that portion of the *Cascade Insurance* opinion because it "engrafts upon the statute a requirement which we now feel is unwarranted." Mutual of Enumclaw asks us to revive that portion of the *Cascade Insurance* opinion that we overruled.

vided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for

recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action.